ALEXANDER, *Receiver, etc., Appellant,* v. RELFE, *Superintendent of the Insurance Department.*

1. **Receiver of Dissolved Insurance Company**: HIS POWER TO SUE. A receiver appointed under section 41 of the Insurance Law, (Wag. Stat., p. 753,) to wind up an insolvent insurance company, represents both the creditors and the stockholders of the company, and when authorized by a proper order of court, may sue in his own name to recover assets of the company from one who has wrongfully misappropriated or wasted them with the connivance or assistance of the company's officers.

2. **Corporations**: THEIR LIABILITY FOR TORTS. It is now well settled law that a corporation is equally responsible as an individual for the wrongs it commits, and will not be heard to deny or evade its liability on the ground that those wrongs resulted from the exercise of powers not granted by the law of its organization.

3. **Withdrawal of Corporate Assets**: FRAUD: RECEIVER. The Life Association of America purchased of the St. Louis Life Insurance Company all of its stock notes together with the mortgages and collaterals given as security for the same, paying for them by its own draft. This draft was afterward subdivided into three others aggregating in amount the same as the first, one being for $900,000, and the other two for smaller amounts. These two latter were subsequently paid. With the stock notes and securities so obtained and a little cash, the Life Association, by the active assistance of the officers and directors of the St. Louis Life Insurance Company, purchased 9763 of the 10,000 shares constituting the capital stock of that corporation, and had the same transferred to itself. By this transfer the offices of the directors of the St. Louis Life Insurance

Company became vacant, and the Life Association caused its own directors to be elected in their places. Using the power thus acquired, the Life Association then procured an amendment to be made to the charter of the St. Louis Life Insurance Company by which the retirement of a portion of the capital stock of the latter was authorized. The Life Association then presented to the St. Louis Life Insurance Company 9000 of its 9763 shares for redemption, and by order of the new board of directors the treasurer of the St. Louis Life Insurance Company redeemed the same by returning to the Life Association the above mentioned draft for $900,000. *Held*, that this transaction if not actually fraudulent (as some of the evidence tended to show that it was) was at least fraudulent in law, and that a subsequently appointed receiver of the St. Louis Life Insurance Company, acting in the interest of policy holders and creditors, could impeach it.

4. ———: ———: MEASURE OF DAMAGES. In such a case as the foregoing the proper measure of damages is an amount equal to the face of the draft with interest.

5. **Practice**: EXCESSIVE VERDICT. The Supreme Court will not reverse a judgment on the ground that the verdict is excessive, unless this point was made in the motion for new trial.

6. ———: EQUITY. In order to avoid circuity of action equity will often permit a recovery in money. See *Baile v. Insurance Co.*, 73 Mo. 371.

*Appeal from St. Louis Court of Appeals.*

REVERSED.

This was a suit brought by Lazelle E. Alexander, as receiver of the Columbia Life Insurance Company, an insolvent corporation, against the Life Association of America, against Henry W. Hough and twelve other persons constituting the board of directors of that association, and against Geo. J. Davis. Alexander held his appointment as receiver under a decree of the St. Louis circuit court rendered in a proceeding brought against the Columbia Life Insurance Company by the Superintendent of the Insurance Department of Missouri. This decree, after enjoining the further prosecution of business by the Columbia, proceeded as follows :

" It is further ordered, adjudged and decreed that the

said Columbia Life Insurance Company, and the same is hereby dissolved, and Lazelle E. Alexander, who was, the 7th day of August, 1877, appointed receiver by this court in this cause, be and he is hereby continued as such receiver of all the assets and property, real, personal and mixed, and of all the rights, claims and choses in action of the said Columbia Life Insurance Company, or to which said corporation, or its stock and policy holders through said corporation, have or had any right, title or interest in law or equity, at the date of the filing of petition in this cause, to-wit: February 22nd, 1877; and it is further ordered, adjudged and decreed that all the right, title and interest of the Columbia Life Insurance Company, or its stock and policy holders, through said corporation, to any and all real or mixed estate and to all personal property, wherever the same may be, and to all rights, claims and choses in action, wherever or in whatever manner existing, as the same existed, belonged to or could be claimed or were held by said Columbia Life Insurance Company, at the date of the filing of the petition in this cause, be and the same are hereby, and the title thereto, fully vested in the said Lazelle E. Alexander, as the receiver and officer of this court, and his legal successors in said office, in trust for the use and benefit of the creditors, stockholders and policy holders of the said Columbia Life Insurance Company, as the same may hereafter be respectively adjudged to be entitled thereto by this court. And the said Lazelle E. Alexander is hereby empowered and authorized as such receiver to demand, receipt for, and take possession of all assets and real, personal and mixed estate, moneys, rights and choses in action, books, papers and evidences of indebtedness of every kind whatsoever of said Columbia Life Insurance Company, as fully as the same existed or could be claimed by said company at the date of the filing of the petition herein; and said receiver is hereby empowered and authorized to sue for and recover, in any court of competent jurisdiction, all property, real, personal and mixed, assets

32—74

and moneys due, books, papers and evidences of indebtedness, as fully as said corporation might or could have done in the full exercise of its corporate powers, or as might or could be done by its policy holders, stockholders or creditors, claiming by or through said corporation."

Prior to the 1st day of March, 1876, the Columbia Life Insurance Company was known by the name of the St. Louis Life Insurance Company. Its capital stock was $1,-000,000, divided into 10,000 shares of $100 each. The whole capital was subscribed, but only a small per cent was paid up, the remainder being represented by the notes of the subscribers secured either by collaterals or by mortgages on real estate. The change in the name of the company was brought about by a vote of the stockholders taken on the 25th day of January, 1876. In the present suit the plaintiff Alexander had judgment in the circuit court against the Life Association, and thereupon legal proceedings were instituted by Wm. S. Relfe, then Superintendent of the Insurance Department of Missouri. These proceedings resulted in the dissolution of the Life Association, and the commitment of its affairs to his charge, and he was then substituted as defendant in place of the Life Association, and took this appeal. The Life Association was a mutual company.

The facts out of which the present suit grew, were as follows: In October, 1875, preliminary negotiations took place between certain officers of the St. Louis Life Insurance Company and the Life Association, which resulted in the passage by the board of directors of the Life Association, on the 13th day of November, of a resolution authorizing its president to purchase the entire capital stock of the St. Louis Life Insurance Company on terms fixed by the resolution. This resolution was afterward, (November 18th,) modified so as to authorize the purchase of not less than 9400 shares. Acting under this authority, the president entered into a contract with defendant Davis dated November 23rd, the terms of which were as follows:

" That the Life Association of America, for and in consideration of $1 to it in hand paid by said George J. Davis, the receipt of which is hereby acknowledged, hereby agrees to purchase of and from said Davis 9400 shares of the capital stock of the St. Louis Life Insurance Company, and as much more as said Davis shall transfer and deliver, the said stock being presented for delivery or assignment within thirty days from date hereof, free from all liens thereon; the certificate of the secretary of the St. Louis Life Insurance Company that there are no liens thereon is to be admitted and taken as sufficient evidence of such fact; provided, however, that said Life Association of America shall not be compelled to accept or pay for a less number of shares than 9400, nor any number of shares unless tendered for assignment within thirty days of the date hereof; and the said Life Association of America hereby agrees to pay to said Davis for said stock so delivered, to-wit: For 9400 shares thereof, the sum of one million, two hundred and fifteen thousand dollars ($1,215,000), and par value for all said stock above that amount; said sum to be paid in the following manner, to-wit: If said Davis assigns and delivers the whole of said stock, to-wit: One million dollars ($1,000,000), then the Life Association agrees to pay to him one hundred and thirty-seven thousand, seven hundred and sixty-six dollars, sixty-six cents ($137,766.66), in cash, and one million, one hundred and thirty-seven thousand, two hundred and thirty-three dollars and thirty-four cents ($1,137, 233.34), by draft of Henry W. Hough, President of the Life Association of America, on the Life Association of America, and accepted by it, payable to said Davis at one day's sight.

" But should said Davis assign and deliver 9400 shares or over, and less than 10,000 shares, then the said Life Association may deduct from the cash to be paid to him, as aforesaid, less such sum or sums of money as have been paid in cash to the St. Louis Life Insurance Company, for or toward or in connection with the taking of the stock of

the said St. Louis Life Insurance Company, by the parties holding the same, or to whom the same was issued, which stock said Davis does not deliver, and there shall be deducted from the draft hereinbefore provided for, the amount of the loan made to the holders of the stock not delivered, on account of the said stock, the securities for said loan being held by the St. Louis Life Insurance Company; and said cash and loans, so deducted for the amount of stock not delivered, shall not together exceed the par value of the stock not delivered; and in consideration of the premises above set forth, said Davis agrees to use all efforts in his power to procure 9400 shares or more, of the capital stock of the St. Louis Life Insurance Company, and receive the cash and draft above set forth, to be delivered by him to the Life Association of America, as aforesaid.

" And if he delivers the whole of the 10,000 shares of said stock, and receives the draft hereinbefore provided to be given him therefor, that with such draft he will, contemporaneously with the transfer of said stock, procure from the said St. Louis Life Insurance Company—

| | |
|---|---:|
| Real estate amounting to | $212,329.01 |
| Collaterals | 196,675.95 |
| Bills receivable | 12,837.69 |
| Bonds and stock | 289,423.86 |
| The capital stock of the Commercial Fire Insurance Company | 268,000.00 |
| The capital stock of the Exchange Bank | 90,000.00 |
| Capital stock of the Security Bank, held by the St. Louis Life Insurance Company | 40,000.00 |
| Accrued interest over and above excessive interest | 27,967.03 |

"The above items being the same amount as the draft to be given, for which it is to be substituted. But, if the said Davis shall be unable to perfect, assign and deliver to said Life Association of America the entire 10,000 shares of stock, and should deliver 9400, or more shares thereof, then said Davis shall not be required, on said draft so re-

·ceived by him from the Life Association of America, to procure from the St. Louis Life Insurance Company the entire amount of real estate, loans, collaterals and bills receivable aforesaid; but shall be only required to procure from said St. Louis Life Insurance Company such loans, ·collaterals and bills receivable, after deducting therefrom the amount of indebtedness of each of the said stockholders owning the stock which said Davis is unable to deliver to said Life Association of America, which indebtedness .accrued on loans made at the time the said respective stockholders took their stock or in connection therewith."

In pursuance of this contract the Life Association of America delivered to Davis a draft drawn by its president upon its treasurer for $1,111,894.34, together with cash to the amount of $130,401.66. With the draft Davis purchased from the St. Louis Life Insurance Company all of its stock notes, together with the mortgages and collaterals securing them, the whole amounting at their face value to $1,111,-894.34. With the aid of Britton, Lomax and Bogy, respectively vice-president, secretary and director of the St. Louis Life Insurance Company, Davis obtained 9673 shares of the stock, and on the 10th day of December transferred the same to the Life Association of America. The stock was in every instance paid for by returning to the stockholder his stock note and paying him in addition a sum in ·cash or other securities equal to what he had paid in. More than 5,000 shares was obtained from the directors of the St. Louis Life Insurance Company, Britton alone transferring 346 shares held in his own right and 2,879 shares held in trust for himself and several other members of the board. Of the cash received by Davis $82,500 were paid to Lomax for brokerage; the remainder was used in· the purchase of the stock. Up to the 20th day of November Davis was a member of the board of directors of the St. Louis Life. On that day he resigned and his resignation was formally accepted on the 30th. On the 10th day of December the offices of the old directors of the St.

Louis Life Insurance Company having become vacant by the assignment of their stock, new men were elected to fill their places. The thirteen persons who at that time constituted the board of directors of the Life Association of America were the persons elected. To qualify them ten shares of the stock received from Davis were transferred to each.

The draft above spoken of was payable to the order of Davis one day after sight. Immediately upon its delivery to the St. Louis Life Insurance Company it was de-. posited in the safe of that company and was never presented for payment, the cashier being instructed by the new management to hold it. At this time the Life Association of America had less than $100,000 cash on hand. The draft remained with the St. Louis Life Insurance Company until the 31st day of December. On the 28th day of December the Life Association entered into a contract with the St. Louis Life Insurance Company for the re-insurance of all the risks of the latter company for the sum of $1,275,000, and on the 31st the draft of the Life Association was returned to it in payment *pro tanto* of this amount. On the 2nd day of February, 1876, this contract was by mutual agreement of the companies rescinded, and the Life Association returned to the St. Louis Life Insurance Company the consideration it had received under the contract, not the original draft, however, but three others aggregating the same amount, one for $900,000, one for $144,598.34 and one for $67,300.

In the preliminary negotiations between the officers of the two companies, Britton and Lomax had mentioned that their company might acquire the power to retire a part of its stock, and had explained the steps by which this could be done; but nothing was done at that time in that direction. On the 28th day of December a resolution was passed by the new board of directors of the St. Louis Life Insurance Company calling a meeting of the stockholders to be held January 25th, 1876, to vote upon pro-

posed amendments to the charter. Due notice was given, and at the appointed time the election was held, and the amendments adopted. One of these amendments changed the name of the company from the St. Louis Life Insurance Company to the Columbia Life Insurance Company, the change to take effect on the 1st day of March, 1876. Another authorized the board of directors, at any time it might see fit, by a two-thirds vote, to direct the application of all surplus assets, over and and above a specified reserve fund, (intended to be sufficient to secure all outstanding liabilities,) to the reduction of the capital stock of the company. These amendments were approved by the Attorney General of the State, and a license to do business under the amended charter was issued to the company by the Superintendent of the Insurance Department. On the 5th day of February the Life Association caused a certificate for 9,000 of its 9,763 shares to be presented to the St. Louis Life Insurance Company for redemption, and the same was surrendered to the treasurer of the latter company, who, acting under a resolution of the board of directors passed under the above provision of the charter, received the same and paid for it by returning to the Life Association of America its $900,000 draft. The drafts for $144,598.34 and $67,300 were subsequently paid by cross-charges in transactions between the companies. At the time these transactions took place the St. Louis Life Insurance Company was insolvent.

The evidence given at the trial showed the foregoing state of facts. In addition the plaintiff gave evidence tending to show that the whole transaction was a fraud from beginning to end on the part of the Life Association and those who assisted in carrying it out, the object of which was to obtain control of the St. Louis Life Insurance Company and to appropriate and waste its assets. On the part of the defendants evidence was given tending to rebut this charge and to establish the entire good faith of the transaction. Plaintiff dismissed as to Davis and four of the di-

rectors, and the court found for the other directors and gave judgment for them. The court found against the Life Association of America and gave judgment for $1,-099,200, being the amount of the draft with interest. From this judgment, as before stated, Superintendent Relfe appealed to the St. Louis court of appeals, where the judgment was reversed and the cause ordered dismissed on two grounds, 1st, the plaintiff could not sue in his own name, and, 2nd, supposing the plaintiff could sue in his own name, he woud be restricted to such actions as the corporation could have maintained had it been in existence. And from this judgment of the court of appeals the plaintiff brought the case to this court by appeal.

*Pope & McGinnis, W. L. Scott* and *Dryden & Dryden* for appellant.

1. The decree appointing Alexander and defining his powers as receiver was rendered in the proper exercise of the jurisdiction conferred by the statute, and plaintiff had full power to prosecute this suit by virtue of the decree. 1 Wag. Stat., p. 754, § 41. The power of determining what was needful to the winding up was lodged by the statute in the circuit court; and this power having been exercised, that is the end of the matter. Freeman on Judg., § 124; *Prigg v. Adams*, 2 Salk. 674; *Gorrill v. Whittier*, 3 N. H. 265; *Wood v. Peake*, 8 John. 69; *Brackett v. Brackett*, 53 Mo. 265; 18 N. Y. 592; 55 Mo. 181; 57 Mo. 160.

2. When a statute confers the authority, and imposes the duty to do a thing, it, by necessary implication, confers the authority to do all things necessary, or conducive, to the full performance of such thing. And as the collection of the assets of a dissolved corporation is necessary to its winding up, and as suits may be necessary to the collection of such assets, the power to wind up the corporation involves, by necessary implication, the power to institute such suits; and as it is essential to the bringing of such

suits that the power to sue should be lodged in some individual, this decree lodging this power in plaintiff, to the end that the assets may be collected, was a valid and legitimate exercise of the authority under the statute. *Pittstown v. Plattsburg,* 18 John. 418; *Supervisors v. Stimson,* 4 Hill 136, 137; *Grant v. Fancher,* 5 Cow. 311; *Glasgow v. Lindell,* 50 Mo. 79; *H. & St. Jo. R. R. Co. v. Marion Co.,* 36 Mo. 294, 304. The decree vesting the plaintiff with the power to institute suits to collect the assets, and to that end with all rights of action existing in the dissolved corporation, and its creditors and stockholders "by and through said corporation," presents the most judicious, effective and complete method for the winding up of the affairs of the corporation which could have been adopted.

3. Upon the dissolution of the Columbia its assets constituted a trust fund for the benefit, first of its creditors, and after they are paid, of its stockholders. *Curran v. Arkansas,* 15 How. 304; *R. R. Co. v. Howard,* 7 Wall. 392; *Sawyer v. Hoag,* 17 Wall. 610; *Sanger v. Upton,* 91 U. S. 60; Field on Corp., § 174. The execution of this trust is, by the statute, devolved on the court. No officer, receiver or other trustee is appointed by the statute to wind it up. It is the case of non-appointment and non-existence of a trustee, the trust fund being in the hands of the court for administration by virtue of the authority and duty devolved on it to wind up its affairs—a case where the execution of the trust may fail for want of a trustee. It thus calls into exercise the inherent and original jurisdiction of the court as a court of equity to appoint a trustee for the purpose of properly executing the trust. Perry on Trusts, §§ 38, 240; Story's Eq., §§ 1059, 1060; Tiff. & Bull. on Trusts, pp. 383, 384; *Breedlove v. Stump,* 3 Yerg. 257; *Franklin v. Franklin,* 2 Swan 528; *Rogers v. White,* 1 Sneed 68; *Montpelier v. East Montpelier,* 29 Vt. 12.

4. In enacting statutes for the dissolution of corporate bodies and winding up their affairs, either one of two plans has been adopted. The first, which prevails in Eng-

land and in a few of the American states, provides for the continuation of the corporate existence, either fully or in a *quasi* way, so that the corporate name may be used until the business of winding up has been completed. Gen. St. Mass. 1860, pp. 388, 389, §§ 36, 37; Gen. St. Vt. Appendix 1870, p. 983; Hurd St. Ill. 1877, p. 283, §§ 10, 11. The second plan, which prevails in nearly all the American states, provides for the entire dissolution of the corporation first, and when this is done, some one, called, sometimes, a trustee, sometimes an agent, and sometimes a receiver, is appointed to take the title to all assets, with capacity to sue and be sued in his own name. *Attorney General v. Ins. Co.*, 77 N. Y. 272; R. S. Wis., §§ 2787, 3219, 3246; Rev. Code Ga., § 1688; *Hardwick v. Hook*, 8 Ga. 358; Code of Ala., § 2057; *Hayes v. Brotzman*, 46 Md. 519; Code of Iowa, §§ 3363, 3366; *Grant v. Davenport*, 18 Iowa 179; Gen. St. R. I., chap. 140, §§ 45, 46; *Hayes v. Kenyon*, 7 R. I. 136; Civil Code of Cal., § 400; Revision of N. J., p. 187, §§ 57, 58, 60. These statutes were intended as a total repeal of the common law rule under which the realty of a corporation upon its dissolution reverted to the grantor, and its personalty escheated to the estate, and under which all actions against it abated and all in its favor were extinguished. 2 Wait's Act. and Def., 350; *Heath v. Barmore*, 50 N. Y. 305; *Nat. Bank v. Colby*, 21 Wall. 609. And as under the old law either the grantor or the State took the title, a proper construction of the new law requires that it shall vest in some one as trustee for creditors and stockholders.

5. There is an essential difference between an ordinary receiver in chancery and a statutory receiver appointed to wind up the affairs of a dissolved corporation. The distinctive feature of an ordinary receiver is that he is a mere custodian. He holds property or receives its rents, issues and profits pending a dispute between opposite parties to a suit, and there is no change of title or of the rights of parties by virtue of his appointment. Hence, it has been held that suits which are founded on the assumption of title in

the person suing should not be brought by the receiver in his own name. Bouvier's L. D. Receiver; Edw. on Rec., 2; Kerr on Rec., 192. But even in cases of this character it is settled that " The court may, under certain circumstances, confer upon a receiver the right to sue in his own name." Kerr on Rec., 192, note; *Leonard v. Storrs*, 31 Ala. 488; *Hardwick v. Hook*, 8 Ga. 358; *Adams v. Woods*, 15 Cal. 206; *Iddings v. Bruen*, 4 Sandf. Ch. 417; *Wray v. Jamison*, 10 Humph. 186; *Helm v. Littlejohn*, 12 La. Ann. 298; *Baker v. Cooper*, 57 Me. 388; *Lathrop v. Knapp*, 37 Wis. 307; *Davis v. Gray*, 16 Wall. 203. The special circumstances which made it not only proper but necessary for the court to authorize plaintiff to sue in this case in his own name were of a controlling character. The corporation had been dissolved; it could not hold the title after it had ceased to exist, and the objection that the suit should be in the name of the former owner, did not apply; there was no one known to the court or to the receiver in whose name a suit could be brought except the receiver; the president and directors could not be authorized to sue, even if this had not been an insurance corporation, because they were to be defendants in the action, their official acts were to be called in question; they had been enjoined from further participation in the management of the affairs of the company; the assets were a trust fund, and it was the court's duty to see that it was not lost or endangered for want of a trustee.

6. But if the court could not under ordinary chancery practice do this, it would by no means follow that the receiver of a dissolved corporation could not sue in his own name. Here is a new jurisdiction conferred on the court by statute to accomplish a certain object, viz: the winding up of the affairs of a dissolved corporation. Authority is given not only to appoint a receiver but to make all necessary orders to accomplish the winding up, and thus to confer enlarged powers on the receiver. Such a receiver is essentially a trustee, corresponding to an assignee in

bankruptcy. Capacity to take the title and to maintain suits, to collect the assets is "needful" to such a receiver, and the court was, therefore, expressly authorized to confer such capacity on him. *Miller v. MacKenzie*, 29 N. J. Eq. 291; Kerr on Rec., 182; Edw. on Rec., 5; *Atlas Bank v. Nahant Bank*, 23 Pick. 489; *Hayes v. Kenyon*. 7 R. I. 136; High on Rec., 303, 314, 319, 320.

7. The policy of our insurance laws is to take the administration out of the hands both of the company and its creditors. The directors cannot make an assignment. The superintendent of insurance alone can institute proceedings to wind up the company. The State has taken upon itself the duty of winding up, through the court, the affairs of such corporations, because it has deemed it a duty of government to guard the interests of beneficiaries of policies, many of whom are women and children. It would be anomalous, if not altogether absurd, to permit parties, not allowed to begin the winding up, to assume control of it after it has been begun. *Relfe v. Ins. Co.*, 5 Mo. App. 580.

8. To construe section 41 to mean that a receiver must administer as to assets actually in hand, while policy holders or stockholders are to administer as to assets to be recovered by suit, is to provide for a double administration, with infinite confusion and greatly increased expense without compensating advantage. The legislature cannot be supposed to have intended any such thing.

9. The facts alleged and proven constitute the Life Association a trustee *de son tort*, and liable as such for all the loss sustained. Perry on Trusts, § 245. *Hennessey v. Bray*, 33 Beav. 96; *Rolfe v. Gregory*, 11 Jur. N. S. 98; *White School House v. Post*, 31 Conn. 240; *Maclaurine v. Monroe*, 30 Mo. 470. The agents employed to procure control of the Columbia being its directors, and one of them its confidential legal adviser, could assist the Life Association in accomplishing its said purpose only by breach of official and professional duty. A director, as well as the general

attorney of a corporation, must devote himself entirely to its interests, and cannot assist a party seeking to acquire control over his company in accomplishing that object. *Wardell v. R. R. Co.*, 5 Cent. Law J. 527; *s. c.*, 4 Dill. 330; *Jackson v. Ludeling*, 21 Wall. 616; *San Diego v. San Diego*, 44 Cal. 106; *Abbott v. Am. Hard Rubber Co.*, 33 Barb. 578; *N. Y. C. Ins. Co. v. Nat. Pro. Ins. Co.*, 14 N. Y. 85; *Utica Ins. Co. v. Toledo Ins. Co.*, 17 Barb. 132; Perry on Trusts, § 207; *Ex parte Bennett*, 10 Ves. 398, 400; *Cum. Coal Co. v. Sherman*, 30 Barb. 551; Bigelow on Frauds, 202; *Nesbit v. Lockman*, 34 N. Y. 167; *Thornton v. Irwin*, 43 Mo. 163; *Lingle v. Hogan*, 45 Mo. 109; *McAllen v. Woodcock*, 60 Mo. 180.

10. The law requires that insolvent life insurance companies should be dissolved and their affairs wound up. The purpose of the defendant corporation, as alleged in the petition, was not only to appropriate and waste the assets of the insolvent company, but to obtain control and manage its business, and thus to defeat the policy of the law by preventing the winding up of its affairs. *Relfe v. Ins. Co.*, 5 Mo. App. 182. The acts done by the defendant corporation in furtherance of its said illegal purpose resulted in the loss of the assets of the Columbia Company. Illegal acts resulting in damage constitute a cause of action.

11. The assets to be withdrawn represented the unpaid capital stock of the Columbia Company, and were thus a trust fund. *Sawyer v. Hoag*, 17 Wall. 610. Wholly irrespective of the insolvency of the Columbia Company, it was a violation of the statute of the State to substitute the unsecured draft of the defendant corporation for such assets; the statute requiring the unpaid capital stock to be represented by the notes of the respective stockholders, "with good and sufficient security other than the stock of the company." 1 Wag. Stat., p. 744, § 19. As an actual loss in respect to this unpaid stock is alleged to have re-

sulted from the acts done, a cause of action is well stated for this reason.

12.  If no conspiracy or fraudulent intent had been alleged, the petition would not have been faulty on that account, because the intent is immaterial here.  This is not a criminal case, or one involving vindictive damages. Where an action either at law or in equity is for the purpose of compelling defendant to pay damages or make compensation for property injured or appropriated, the intent is immaterial.  If it is alleged and proven that defendant did certain acts, he is held to have intended all the natural consequences of such acts; and if such consequences involve an invasion of the rights of the plaintiff the defendant is liable, let his motive be what it may.

13.  The Life Association cannot set up that its acts were *ultra vires*.  A corporation when called upon to deliver up trust funds of which it is wrongfully possessed, or to account for trust funds of which it has made an improper disposition, cannot plead a want of chartered power to do what it has in fact done.  It is liable in the same way and to the same extent as a natural person for all injuries to property done by its agents within the scope of their employment, and for all other wrongs done by its direction, whether within the limits of its charter or not.  Its authority to its agents is implied where they act in the line of their employment; but as to things done under resolution of its board of directors, the authority is direct, and the liability is limited only by the extent of the injury done.  *Snyder v. R. R. Co.*, 60 Mo. 413 ; Green's Ultra Vires, 243 ; *Casey v. La Societé*, 2 Woods 77; *Madison Ave. Church v. Baptist Church*, 73 N. Y. 82 ; *N. Y. & N. H. R. R. Co. v. Schuyler*, 34 N. Y. 56; *Bissell v. R'y Co.*, 22 N. Y. 258; Field on Corp., § 333; *Perkins v. R. R. Co.*, 24 N. Y. 213; *Lee v. Sandy Hill*, 40 N. Y. 451 ; *Poulton v. R'y Co.*, L. R., 2. Q. B. 534 ; Cooley on Torts, p. 119; *Na't B'k v. Graham*, 100 U. S. 699.

14.  If it were conceded that the purpose of the As-

sociation was legitimate, that the contract providing for the draft was legal, and that the draft was not only legal but properly delivered, the Association would be in no better condition, because it would then be the holder of unpaid stock in the Columbia, and it could not surrender said stock or cancel it by any sort of manipulation. Its draft would, also, in that event become evidence of liability for its full amount, and it could not be satisfied in any way, except by actual payment.

15. If the stock were considered as fully paid, and the draft a valid obligation, the retirement of the stock could not have satisfied the draft for two reasons: (1) The Columbia did not have a surplus of assets to the amount of $900,000, or to any amount, and there was, therefore, nothing to be applied to the redemption of stock, if there had been any power in the company to retire its stock under any circumstances. (2) There was no law authorizing the company to redeem and retire a portion of its stock if it had been possessed of a surplus over and above its liabilities. The assets being a trust fund for the payment of debts, and the creditors having a lien thereon in equity, it was not competent for the corporation to amend its charter and provide for the use of the assets in redeeming stock, to the waste of the fund.

*James Carr* and *Geo. D. Reynolds* for respondent.

1. This being an action by the receiver, in his own name, and for unliquidated damages, appellant cannot recover. Because (*a*) No statutory power to sue either in his own name or for unliquidated damages exists. (*b*) A receiver, as such, has no right at common law, nor by the practice of chancery, to sue in his own name. No statute of this State changes this. Kerr on Rec. in Eq., (Bisp. 2 Ed.) pp. 2, 168, 169, 183, 206, n. 1; 2 Daniel Ch'y Pr., (Perks. Ed.) p. 1438; Ib., chap. 39, § 10; *Manlove v. Berger*, 38 Ind. 211; *Battle v. Davis*, 66 N. C. 255; *King v. Cutts*,

24 Wis. 625; *Green v. Winter*, 1 John. Ch. 60; *Freeman v. Winchester*, 10 Sm. & M. 577; *Yeager v. Wallace*, 44 Pa. St. 294; *Waterhouse v. Jamieson*, 2 Pat. H. L. Scotch App. 1812; 2 Wag. Stat., art. 2, chap. 76, § 41; R. S. 1879, §§ 3660 to 3662, 427 to 431, 744, 745, 6043, 6044; *Farmers', etc., Ins. Co. v. Needles*, 52 Mo. 17; *Hannah v. Moberly B'k*, 67 Mo. 678; *State v. Gambs*, 68 Mo. 289. But in the case at bar, no power is in terms conferred on him to sue for this class of claims. Hence, he is not within the reason of *Davis v. Gray*, 16 Wall. 203. (c) Section 41 of the insurance law, under which appellant was appointed, did not change the equity practice, nor is it inconsistent with the other statutory provisions. While it grants to the court full equity powers, it assumes they will be exercised according to chancery precedents and the analogies of the law. It did not authorize the taking away of the title to the property of the corporation and vesting it in a receiver, nor did it take away the rights of the stockholders and creditors and vest them in the receiver. A decree which does this is void. *Relfe v. Ins. Co.*, 5 Mo. App. 173; *Relfe v. Spear*, 6 Mo. App. 129; *Thatcher v. Powell*, 6 Wheat. 119; *Piscataqua, etc., Ins. Co. v. Hill*, 60 Me. 178; *People v. Life Ins. Co.*, 79 N. Y. 267; *s. c.*, 8 Ins. Law J. 859; 1 Story Eq. Jur., (10 Ed.) §§ 11 to 20. (d) Applying by analogy the statutory provisions, as interpreted by our courts, which govern actions by administrators, (see *Merry v. Fremon*, 44 Mo. 518,) or which govern actions by assignees, (see *Shultz v. Christman*, 6 Mo. App. 338; *Heinrichs v. Wood*, 7 Mo. App. 236,) or which govern, in case a corporation is dissolved and its affairs are wound up by the last board of directors as trustees, (see §§ 744, 745, R. S. 1879; *Powell v. R. R. Co.*, 42 Mo. 63; *McCoy v. Farmer*, 65 Mo. 244,) or which govern in case of receivers appointed under the General Statute, (see *Hannah v. Moberly Bank, supra*, and *State v. Gambs, supra*,) the appellant cannot recover in this case, whether he represents stockholders, creditors or the corporation. *Mann v. Pentz*, 3 N. Y. 415; Thompson's

Stockholders, § 315, *et seq.*   (e) In this State, where we have no statute enlarging his powers nor making him the trustee or representative of creditors, stock or policy holders, and where he has been appointed in a suit in which the only parties to the record were the Superintendent of the Insurance Department and the corporation, and in which neither creditors, policy holders nor stockholders, as such, were parties, the receiver does not represent any one but the corporation. He is bound by the same acts and defenses which would be available against the corporation he represents. Kerr on Rec., (Bisp. 2 Ed.) p. 2; Ib., chap. 6, pp. 168, 169, 183; *Piscataqua, etc., Ins. Co. v. Hill,* 60 Me. 182; *Relfe v. Ins. Co., supra; McLaughlin v. McLaughlin,* 16 Mo. 242; *Mooney v. R. R. Co.,* 28 Mo. 570; *Peabody v. Flint,* 6 Allen 52; *Kennebec R. R. Co. v. Portland R. R. Co.,* 54 Me. 181.

2. The contract alleged in the plaintiff's petition to purchase the capital stock of the St. Louis Life Insurance Company by the Life Association of America was *ultra vires* of the latter corporation, and consequently void, and, being so, the plaintiff was not entitled to recover thereon. 1 Wag. Stat., chap. 76, art. 2, §§ 1, 44, 46, 48, 50; Ib., (Ed. 1872) p. 290, § 6; *Matthews v. Skinker,* 62 Mo. 329; *Hoagland v. R. R. Co.,* 39 Mo. 451; *St. Joseph v. Saville,* 39 Mo. 460; *Pearce v. F R. Co.,* 21 How. 442; *Elmore v. R. R. Co.,* 23 Conn. 457. It was contrary to the statutes of the State in regard to life insurance, and consequently void; for this reason the petition fails to state facts sufficient to constitute a cause of action, and hence the motion in arrest should have been sustained. *Foll's Appeal,* 91 Pa. St. 434; *s. c.,* 36 Am. Rep. 671; 12 Chi. Leg. News 139. If the contract alleged in plaintiff's petition shall be held to show a cause of action upon its face, still, as it alleges that the Life Association of America returned 9,000 shares of the capital stock of the St. Louis Life to the latter, of the par value of $900,000, said stock is a fair equivalent for the draft, and there was no consideration for the promise con-

33—74

tained in the draft after the return of said stock; a corporation has a right to deal in its own stock. *City Bank v. Bruce*, 17 N. Y. 507; *Taylor v. Miami Ex. Co.*, 6 Ohio 183; *Dupee v. Boston W. P. Co.*, 114 Mass. 37; *Coleman v. Oil Co.*, 51 Pa. St. 74; *Williams v. Savage*, 3 Md. Ch. 418. It is not alleged in the petition that the Life Association of America converted either the assets of the St. Louis Life Insurance Company or the $900,000 draft to its own use; hence the motion in arrest of judgment should have been sustained for that reason. *Perry v. Musser*, 68 Mo. 477. The mere fact of the directors being the same in both corporations did not render the retirement of the stock and surrender of the draft void. *Kitchen v. St. Louis, K. C. & N. R'y Co.*, 69 Mo. 224.

3. On no ground can the judgment for $900,000 and interest be sustained. It is excessive, whether the action be considered a suit for wasting the securities or a suit on the draft.

4. The foundation of plaintiff's case is the alleged combination and conspiracy between Davis and the Life Association to give the latter control of the management and of the business, and to obtain possession of and to use, appropriate and waste the assets of the Columbia. The acts complained of must have been done with a fraudulent intent. A corporation, a mere artificial body, is incapable of having any intent; a fraudulent intent cannot be imputed to it; the officers and directors may have had a fraudulent intent, (though the evidence shows most conclusively that they had none, and the finding of the circuit court is conclusive that they had none;) but even if they had, their fraudulent intent cannot be transferred by intendment from them to the innocent policy holders of the Life Association (who were its only stockholders,) so as to make the trust funds of these policy holders in the hands of the directors of the Life Association responsible for the frauds of the trustees. *New Brunswick R. R. Co. v. Conybeare*, 9 H. L. Cases 725, 740; *West. Bank v. Addie*, L. R.,

1 H. L. Scotch & Div. App. 145, 157. This is not the case of the agent of a corporation committing a tort in the service of his principal. Hence the cases cited by appellant in support of the well settled rule which makes the corporation responsible for the torts of its agents do not apply. A corporation cannot be guilty of false imprisonment, malicious prosecution or assault and battery, (*Childs v. The Bank,* 17 Mo. 217,) because these acts do not come within the objects of the corporation. The Life Association, being a mutual company, had no power to buy up stock of the Columbia, a stock company, not as an investment, but to waste and wreck the company. Hence, it cannot be made liable for the torts of its directors in doing or conspiring to do so. *Gillett v. R. R. Co*, 55 Mo. 319.

*Glover & Shepley* for the Life Association.

The action cannot be maintained on the ground that the purchase by the Life Association of the stock or securities was *ultra vires.* The pleadings affirm the legal validity of these contracts. The plaintiff sues for the value of the draft. The answer avers that the contracts were made in conformity to charter powers. The Life Association by express charter provision had power "to grant, purchase and dispose of annuities and endowments of every kind." 1 Wag. Stat., p. 738, § 1. It also had power to deal in bonds, notes, mortgages and stocks. §§ 27, 48 of the same act; *Hodges v. N. England, etc.,* 1 R. I. 347. But if it had no power to purchase the securities or stock, the contracts were both fully executed, price paid and goods delivered. In such case *ultra vires* is not a good defense. Field on Corp., §§ 259, 260, 261, 263, 265. The action cannot be maintained on the ground that the sale of the stock by the Life Association to the Columbia was a fraud upon its creditors. There is no such cause of action in the petition. No such cause of action was tried. The plaintiff's evidence would seem to show that plaintiff attempted to make a

case of contract, fraud and failure of consideration. The evidence failed to prove it; the court found there was no fraud, and dismissed the individual defendants. The court below, however, found that the contract by which the appellant claimed to purchase the draft was void, because the Columbia Company was insolvent and the retiring of its stock was a fraud on its creditors. This is the ground respondent will seek to maintain here. We insist in regard to this: (1) The finding was a departure from the pleadings. (2) The Life Association had power to sell to the Columbia the 9,000 shares of stock and purchase the draft. The Columbia had power to purchase the stock. *City B'k v. Bruce*, 17 N. Y. 510; *Williams v. Savage*, 3 Md. Ch. 418. If the Columbia was insolvent, or became insolvent by that purchase, the Life Association was not affected by it. It had no knowledge of any fraud on the part of the Columbia toward its creditors. It was not required to know the condition of the Columbia.

## I.

SHERWOOD, C. J.—The right of the receiver to maintain this proceeding in his own name, is established by the recent case of *Gill v. Balis*, 72 Mo. 424, and the decree made under the authority of section 41 of the insurance act is sufficiently comprehensive for the present purpose. The receiver, in instances such as this, represents both the creditors and stockholders, and is to be regarded as the trustee for them. High on Rec., § 314. He cannot, it is true, overthrow any valid act of the corporation which he represents; but when acts have been done in fraud of the rights of creditors, he may litigate for their benefit, though the act in question be valid as to the corporation itself; in which case he holds adversely to the corporation. High on Rec., § 315, and cases cited.

The liability of the defendant corporation is the chief point demanding discussion. No hesitancy can be felt here, that the acts charged and proven; acts which resulted

in despoiling the Columbia Life Insurance Company of its assets, and thus depriving its creditors of opportunity to resort to that trust fund for satisfaction of their claims, were acts which never could have been done, but through and by means of the corporate action of the defendant. If such acts had been those of individuals, of their liability but one opinion would be entertained. Shall it be said that such a wrong as this record discloses, a wrong which would be promptly redressed if perpetrated by individuals, is to go unredressed because it takes shelter behind chartered formalities ?

## II.

If this question is to be answered affirmatively, it would cast a lasting reproach on the administration of public justice. But no such response will be returned, since it is now well settled that a corporation is equally responsible as an individual for the wrongs it commits, and will not be heard to deny, or allowed to evade its liability on the ground that those wrongs resulted from the exercise of powers not granted by the law of its organization. Thus it is said in *N. Y. & N. H. R. R. Co. v. Schuyler*, 34 N. Y. 49 : "Another important legal proposition in the case is so clear upon principle, and so distinctly settled by authority, that nothing but confusion can flow from its discussion. It will bear no more than plain enunciation. A corporation is liable to the same extent and under the same circumstances as a natural person for the consequences of its wrongful acts, and will be held to respond in a civil action at the suit of an injured party, for every grade and description of forcible, malicious or negligent tort or wrong which it commits, however foreign to its nature, or beyond its granted powers, the wrongful transaction or act may be. *  *  No court would hear the corporation assert that its wrongful act was beyond its chartered powers, and, therefore, ineffective to charge it with the injurious consequences of the fraud." Other authorities, equally explicit

in the enunciation of the same doctrine, are cited by counsel for plaintiff. And some of those authorities point out the marked distinction between tortious and contractual liability, for acts *ultra vires*; (Cooley on Torts, 119 ; Field on Corp., § 333;) the corporation being answerable in the. former, but not generally in the latter case.

### III.

The circuit court has found that " the managers of the Association, at the outset, entertained no purpose to wrong the creditors or policy holders of the Columbia Life Insurance Company." But this finding does not alter the responsibility of the defendant, through whose corporate action, a wrongful act, intentionally committed, has occasioned the damage of which the plaintiff complains. For in such cases, it is the injury done which constitutes the gravamen of the relief sought, and not the motive which prompted that injury. Cooley on Torts, 98. And though the proof may not establish that defendant, or those who represented it, its directors, who are regarded as identical with it, (*Lee v. Sandy Hill*, 40 N. Y. 442,) committed an actual fraud, in doing the wrong for which redress is asked, yet it is clearly shown that the wrong committed was a constructive fraud, because done in contravention of that public policy of this State, which forbids the assets of corporations to be wasted, cancelled or in any manner withdrawn from the reach of creditors. Fraud of this description—constructive fraud—though not originating in any actual evil design, having for its purpose the perpetration of injury on others, is yet equally reprehensible with positive fraud, and equally prohibited by law, as within the same reason and mischief as acts and contracts done *malo. animo*. 1 Story Eq. Jur., §§ 258, 259, 260, 261 ; Cooley on Torts, 473. " On the foot of the fraud," therefore, equity can afford relief asked in the name of the receiver, as well as upon the ground of avoiding a multiplicity of suits, which

would have to be brought, if each creditor were compelled to seek a several redress for his own injury.

In consequence of these considerations, it is altogether immaterial whether the acts in question are to be held as falling within the category of actual or constructive fraud. It is sufficient to sáy that those acts were a fraud on the law, the settled policy of which is to sedulously protect the capital stock of corporations, and to steadily annul all ar· rangements or devices whereby that policy can be thwarted. Thompson on Stock., § 201. In the forcible language of Mr. Justice Hunt : " The capital stock of a moneyed corporation is a fund for the payment of its debts. It is a trust fund, of which the directors are the trustees. It is a trust fund to be managed for the benefit of its shareholders during its life, and for the benefit of its creditors in the event of its dissolution. This duty is a sacred one and cannot be disregarded. Its violation will not be undertaken by any just minded man, and will not be permitted by the courts. The idea that the capital of a corporation is a foot-ball to be thrown into the market for the purposes of speculation, that its value may be elevated or depressed to advance the interests of its managers, is a modern and wicked invention. Equally unsound is the opinion that the obligation of a subscriber to pay his subscription may be released or surrendered to him by the trustees of the company. This has been often attempted, but never successfully. The capital paid in, and promised to be paid in, is a fund which the trustees cannot squander or give away. They are bound to call in what is unpaid, and carefully to husband it when received." *Upton v. Tribilcock*, 91 U. S. 47.

Viewing the acts complained of as a fraud on the law, because a fraud on the rights of creditors, we cannot yield assent to the idea advanced that those acts were " simply business transactions, such as daily occur in the world of trade." If such transactions, by which creditors are deprived of that trust fund on which the law has told them

to rely, are indeed of frequent occurrence, the sooner the courts of the country set the seal of their condemnation upon such "simple business transactions," the better. And it must be apparent that if the acts of the two corporations which resulted in the cancellation and retirement of the capital stock, are to be regarded as lawful, then no liability could attach in consequence thereof, either to the corporations or to their agents or directors. So that the affirmance of the legality of those acts on the part of the corporations, of necessity, closes any "rational avenue of redress," even against those individuals "by whom the spoliation was effected or promoted." We are not prepared to accept as sound, either the premises or its palpably obvious conclusion.

## IV.

The next point for consideration is the measure of the damage which has been sustained. Upon full consideration of the matter, we fully concur with the circuit court, that the draft for $900,000, which at one time constituted a part of the assets of the Columbia Life Insurance Company, and was withdrawn by the defendant corporation, is, with legal interest, the proper measure of damages in this case.

## V.

But even if the damages adjudged by the circuit court were excessive, no such point was made in the motion for new trial; no opportunity was given that court to correct the erroneous excess, if any there was, and it is too late to raise the point in this court for the first time. *Sweet v. Maupin*, 65 Mo. 68, and cases cited.

## VI.

And finally, equitable jurisdiction was not ousted because either a judgment in money was asked or rendered. Equity frequently allows of such recoveries in order to avoid circuity of action. *Post v. Ætna Ins. Co.*, 43 Barb. 351;

May on Ins., § 565; *Carpenter v. Mutual Safety Ins. Co.*, 4 Sand. Chy. 408. The judgment of the court of appeals is reversed, and that of the circuit court affirmed. All concur, except RAY. J., not sitting.

*Motion for Rehearing Overruled.*